The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Young, and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties prior to the hearing in a Pre-Trial Agreement which is incorporated herein by reference and at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. At all relevant times, ITT Hartford was the carrier on the risk.
4. Plaintiff's average weekly wage is $466.32 yielding a weekly compensation rate of $310.90.
5. Plaintiff is no longer employed by defendant-employer. After plaintiff's termination, he received unemployment benefits.
6. Defendants' First Set of Interrogatories and Request for Production of Documents and Plaintiff's Answers to Defendants' First Set of Interrogatories and Request for Production of Documents were received into evidence by stipulation of the parties.
7. Dr. Arthur Carter's deposition of 17 June 1998 taken prior to the hearing before the Deputy Commissioner was received into evidence by stipulation of the parties. The deposition George S. Edwards, M.D. taken after the hearing on 17 September 1998 was also received into evidence.
8. Plaintiff's medical records from Dr. Arthur F. Carter, Dr. Charles Frazier, and Moses H. Cone Memorial Hospital were received into evidence by stipulation of the parties.
9. The issues presented are:
 a) Whether plaintiff contracted an occupational disease arising out of and in the course of his employment with defendant-employer?
 b) Whether plaintiff is entitled to any benefits under the North Carolina Workers' Compensation Act?
 c) Whether defendants are entitled to a credit for unemployment benefits and disability benefits paid to plaintiff?
 * * * * * * * * * * *
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Young, plaintiff was a 52 year-old laborer with a high school education. Plaintiff has been employed as a laborer for most of his working life.
2. Plaintiff began working for defendant-employer in 1988 in the cotton opening department or "card room" and continued working in this department until 28 April 1991. Plaintiff's job duties included driving a fork truck to transport bales of cotton, cleaning the cotton opening area and busting bales of cotton weighing approximately 600 pounds.
3. The most strenuous activity plaintiff performed in the cotton opening department was actually busting metal bands, which were wrapped around bales of cotton. This activity involved swinging a double edged axe underhanded below shoulder level to cut eight metal bands on each bale of cotton. Plaintiff testified that he busted six to seven bales per hour, or fifty to eighty bales per day. However, considering that plaintiff also testified that he busted one bale every 20 minutes, it is more likely that plaintiff only busted three to four bales an hour, or thirty-six to forty-eight bales per day. Plaintiff worked twelve hours per day, thirty-six hours one week and forty-eight hours the next week.
4. Prior to busting the metal bands, plaintiff had to walk the bales three to four feet into a line. Plaintiff used his entire body to maneuver bales by rocking them back and forth until they were in a position to be busted. Plaintiff was capable of walking a bale of cotton into position without difficulty. Before plaintiff walked the bale into position, he cut the plastic wrapper off of the bale.
5. While busting the bands, plaintiff busted all but the two end bands while the bale was standing up. Afterwards, plaintiff would then push the bale to the ground and bust the two end bands that remained. Plaintiff would then pull the two bands from under the bales. After busting several bales, plaintiff would take the plastic wrapping and wire bands to the disposal bin.
6. In addition to busting bands, plaintiff had to occasionally scratch dirty places off of the cotton with a scratcher that required cleaning. Plaintiff was also responsible for gathering and disposing of the plastic bags and metal bands and for sweeping the area. Plaintiff took regular breaks and had time to talk and socialize with coworkers.
7. Clayton Marsh was plaintiff's supervisor in the cotton opening department. He continued to work in that department at the time of the hearing before Deputy Commissioner Young. Mr. Marsh has performed the duties in the cotton opening department as well as observed plaintiff perform them. According to Mr. Marsh, plaintiff was a skilled employee who did not complain of any hand or arm problems between 1988 and 1991.
8. On 28 April 1991, plaintiff was transferred to the cloth service department. Plaintiff's job duties in the cloth service department included packaging rolls of cloth. Plaintiff spent four to five hours of his shift operating a fork truck and transporting rolls of cloth to the packaging area. The fork truck was equipped with two long ram poles that would squeeze together underneath the roll of cloth and then the fork truck would squeeze hydraulically to lift the cloth roll off of the floor. Most of the rolls of cloth weighed approximately 1,200 pounds and were far too heavy for any person to lift without using the fork truck. On rare occasions, a roll was too small to be picked up by the ram poles on the fork truck and would therefore be laid across the ram poles.
9. After lifting the roll of cloth with the fork truck, plaintiff would drive the truck fifty to seventy-five feet to a scale where the roll would be weighed. Plaintiff would then raise the roll of cloth up with the fork truck, slide the packaging bag over it and then lower it to the ground and back the truck out from underneath it. While the fork truck elevated the roll, plaintiff slid a bag over the roll. Prior to sliding the bag over the roll, plaintiff would cut the end of the bag with a knife. When the roll came to rest on the ground, it was completely covered by the bag. Plaintiff pulled the cloth roll package ends together and put a twist tie on each end. To twist the tie, plaintiff used a tool called a "twister" instead of using his fingers or hands. The "twister" allowed plaintiff to twist the twist tie around the ends of the packaging using only one hand. After the roll was packaged, plaintiff lifted the roll of cloth with a forklift and set it on a sloped table. If the cloth did not roll freely down the incline of the table, plaintiff would have to nudge it. In addition to driving the fork truck and packaging cloth rolls, plaintiff had a certain amount of time away from these duties in the event a doffer quit doffing. Plaintiff's job required little to no lifting above shoulder level.
10. Plaintiff's supervisor in the cloth service department since late 1994 was Floyd Womble who observed plaintiff performing his job. Although plaintiff testified that as part of the packaging process he had to grab the bag with both hands and shake the cloth roll packaging violently while lifting the rolls, Mr. Womble explained that this was not part of plaintiff's job and that the rolls of cloth were elevated by the fork truck and thus the packaging could simply slide over the roll. Mr. Womble's description of the packaging process is given greater weight than that of plaintiff.
11. Since plaintiff last worked in the cloth service department, defendant-employer has implemented significant mechanical changes to the packaging process. The use of a hydraulically controlled ram pole has taken the place of the fork truck, however the remainder of the job duties including the wrapping of the cloth rolls is still performed in the same manner.
12. Plaintiff did not complain of difficulties with his hands or arms until approximately July 1995. Furthermore, he never indicated to Mr. Womble or the plant nurse, Wanda Smith, that his problems were related to his work in the cloth service department. In fact, in August 1995 plaintiff reported to Nurse Smith that he felt his problems were related to the job he had performed in the cotton opening department from 1988 to 1991. He did not mention that any job since 1991 had affected his hands or arms. Plaintiff continued to perform his job in the cloth service department.
13. Plaintiff's pain worsened and he presented to his family doctor, Charles Frazier, M.D., who referred plaintiff to Arthur Carter, M.D., an orthopaedic surgeon. Plaintiff was seen by Dr. Carter on 8 September 1995 and diagnosed with bilateral carpal tunnel syndrome and tenosynovitis of both hands. Dr. Carter placed a wrist splint on plaintiff's right wrist and treated plaintiff conservatively.
14. When plaintiff sought treatment from Dr. Carter for weakness and pain in his wrists and occasional numbness in his fingertips, he reported inaccurately to Dr. Carter that it was due to all of the twisting, grasping and pinching motions that his job or jobs required. Moreover, on 8 September 1995, plaintiff told Dr. Carter that his job involved repetitive motion. This description of plaintiff's job is inaccurate and is the description upon which Dr. Carter relied in finding a causal relationship between plaintiff's condition and his employment. In fact, Dr. Carter was not provided with sufficient evidence regarding plaintiff's job duties, their nature including how strenuous or continuous they were, or whether there were any breaks provided for plaintiff. Since Dr. Carter was given insufficient and inaccurate evidence regarding plaintiff's job duties, his opinions regarding causation are given little weight as they were based on inaccurate assumptions.
15. Plaintiff was again seen by Dr. Carter on September 26, 1995 and still complained of pain in his wrists and hands stating that the right side was worse than the left and numbness persisted in the fingers of his right hand with weakness in his grip. Dr. Carter restricted plaintiff's work by ordering no heavy lifting or pushing on his job.
16. Over the next several months, plaintiff's condition worsened and on May 13, 1996, plaintiff reported to Dr. Carter that on or about May 1, 1996, he had heard a pop in his left wrist and then developed swelling and pain and almost complete loss of the use of his left hand. Dr. Carter took plaintiff out of work. On June 5, 1996, Dr. Carter performed carpal tunnel release surgery on plaintiff's left wrist and kept plaintiff out of work until September 24, 1996.
17. Upon plaintiff's return to work on or about September 25, 1996, plaintiff was placed in a roller cleaning job where he had to squeeze rollers. By October 7, 1996, plaintiff was again complaining of swelling in his left wrist and had begun to experience pain in his shoulders and arms. Dr. Carter restricted plaintiff to half-day duty.
18. On October 28, 1996, plaintiff reported to Dr. Carter that he had continuing pain radiating up both shoulders when pushing and pulling rolls of cloth at chest level. Plaintiff also reported his return to 12 hour per day shifts, which were difficult to complete due to his pain. Dr. Carter determined that plaintiff still had right carpal tunnel syndrome and had bilateral impingement syndrome of the shoulders. Dr. Carter took plaintiff out of work.
19. Plaintiff continued to complain of shoulder pain bilaterally, right hand and arm pain as well as left arm pain when he presented to Dr. Carter on February 3, 1997. Dr. Carter recommended vocational rehabilitation and work hardening programs and released plaintiff to return to work for an eight hour work day with no heavy lifting, pushing or pulling. On February 24, 1997, Dr. Carter received and approved plaintiff's new job description. Nevertheless, as of April 3, 1998, defendant-employer no longer had an eight hour job available for plaintiff; therefore, plaintiff was laid off with approximately 40 other employees.
20. At the hearing before the Deputy Commissioner, defendants produced a videotape depicting the cotton opening job and the cloth service job. There was also a written description provided of the cotton opening job. The videotape and the written job description accurately depict the cotton opening job as plaintiff performed it. The videotape depicts the cloth service job as performed after the ram pole was substituted for the fork truck which plaintiff drove while he worked in the cloth service job. In fact, all of the cloth service job duties plaintiff was required to perform are accurately reflected on the videotape except plaintiff's use of the fork truck. The videotape fairly and accurately depicts plaintiff's cloth service job.
21. The videotape is competent evidence of plaintiff's job duties in both cotton opening and cloth service and is sufficient and proper evidence upon which a competent medical opinion may be based.
22. George S. Edwards, Jr., M.D., an orthopaedic surgeon who specializes in the treatment of the hand and the upper extremity, reviewed the videotape depicting plaintiff's cloth opening job. Dr. Edwards explained that two factors are important for repetitive motion to cause carpal tunnel syndrome, specifically the amount of force and the frequency of a particular motion. Based on his review of the videotape depicting the cotton opening job, Dr. Edwards did not feel that plaintiff's conditions were caused by his job in the cotton opening department and plaintiff was not placed at an increased risk as compared to the general public. Furthermore, Dr. Edwards felt that plaintiff's performance of the cotton opening job was too remote to be a causal factor, in that, if plaintiff's condition were related to that job, it would have developed much earlier than 1995. Dr. Carter concurred in the opinion that the cotton opening job was too remote to have been the cause of plaintiff's conditions. Furthermore, even the most strenuous duty of swinging the axe to bust the bales was not considered by Dr. Edwards to be a cause of plaintiff's conditions.
23. Dr. Edwards also reviewed the portion of the videotape depicting plaintiff's cloth service job which accurately depicts the job as performed by plaintiff with the exception that the ram pole has taken the place of the fork truck which plaintiff drove 4 to 5 hours a day. Additionally, Dr. Edwards was presented with a hypothetical by defense counsel accurately describing any additional duties including the use of the fork truck. Dr. Edwards indicated that plaintiff's cloth service job was not repetitious or strenuous enough to cause or to significantly contribute to the development of plaintiff's conditions. Further, Dr. Edwards determined that plaintiff did not develop carpal tunnel syndrome as a result of his employment with defendant-employer and that plaintiff was not placed at an increased risk as compared to the general public.
24. In conclusion, Dr. Edwards was presented with accurate and sufficient evidence of plaintiff's job duties, including the videotape and supplementary information clarifying the changes made in 1995 implementing the ram pole instead of the fork truck, upon which to base his conclusion. His testimony is given greater weight than that of Dr. Carter who did not review the videotape and who was provided insufficient and inaccurate information concerning plaintiff's job duties. Finally, Dr. Edwards' opinion is given greater weight regardless of the fact that he did not examine or treat plaintiff.
25. Plaintiff has failed to establish by the greater weight of the evidence that the nature of his employment with defendant-employer was a significant contributing factor or was causally related to the development of plaintiff's bilateral carpal tunnel syndrome, tenosynovitis or bilateral impingement syndrome of his shoulders. Furthermore, plaintiff has failed to establish by the greater weight of the evidence that the work he performed for defendant-employer placed him at an increased risk of developing bilateral carpal tunnel syndrome or bilateral impingement syndrome of his shoulders.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows
 CONCLUSION OF LAW
Plaintiff has failed to prove by the greater weight of the evidence that his employment with defendant-employer significantly contributed to or caused his bilateral carpal tunnel syndrome, tenosynovitis, or bilateral impingement syndrome of his shoulders. Furthermore, his conditions of bilateral carpal tunnel syndrome and bilateral impingement syndrome are not due to causes and conditions characteristic of and peculiar to his particular employment with defendant-employer to which the general public is not equally exposed. Therefore, plaintiff is not entitled to compensation under the Act. N.C.G.S. § 97-53(13), § 97-53(21) and § 97-2.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission rejects the holding of the Deputy Commissioner and enters the following
 ORDER
1. Plaintiff's claim under the Act must be, and the same is, hereby Denied.
2. Defendants shall pay the costs, including an expert witness fee of $470.00 to Dr. Edwards, if not already paid.
This the ___ day of March 2000.
 S/ ___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER
DCS: nwg